IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDRE I. WASHINGTON, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-22-2809 |
| ASRESAHEGN GETACHEW et al., | * | |
| Defendants. | * | |

\*\*\*

# MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Dr. Asresahegn Getachew's Motion to Dismiss, or Alternatively, for Summary Judgment (ECF No. 14)[1] and self-represented Plaintiff Andre I. Washington's Motion to Dismiss (ECF No. 20), construed as an Opposition to Dr. Getachew's Motion. The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will grant Dr. Getachew's Motion and deny Washington's Motion.

## I.     BACKGROUND

**A.     Factual Background**

**1.     Washington's Allegations**

Washington alleges that he has been denied proper and timely medical treatment for a hand injury as well as chronic Crohn's disease in violation of the Eighth Amendment's

---

[1] The case is and remains stayed as to Corizon Healthcare, Inc. (See July 18, 2023 Order, ECF No. 17). The Clerk will be directed to correct the name of Corizon Healthcare, Inc. on the docket.

guarantee against cruel and unusual punishment. (Compl. at 9, ECF No. 1).[2] He alleges that he injured his hand on April 18, 2022, and was denied medical care despite numerous sick calls, including one directed to Dr. Getachew. (Id. at 9–10). Washington also states that he suffers from Crohn's disease for which he was not provided adequate treatment. (Id. at 12). He alleges that he directed sick calls to Dr. Getachew regarding his Crohn's symptoms as well and received no response. (Id. at 9–12).

### 2. Dr. Getachew's Response

Dr. Getachew states that he is a medical doctor at Western Correctional Institution ("WCI") and that he also sees patients at North Branch Correctional Institution ("NBCI"). (Getachew Decl. ¶ 2, ECF No. 14-2). He explains that he also acted as the Regional Medical Director. (Id. ¶ 3). Dr. Getachew explains that he has no role in the sick call process and that he does not receive or review sick call slips, nor does he schedule medical appointments or have any role in scheduling. (Id. ¶ 6). Instead, he relies on the nursing staff and schedulers. (Id.).

Dr. Getachew avers that he did not ignore or disregard Washington's medical needs, and that he had limited involvement with Washington's medical care, as he was not his onsite provider. (Id. ¶ 29). He states that Washington has been seen and examined multiple times for Crohn's disease, monitored through labs, sent to the hospital as necessary, and presently continues to receive medication and care for this condition. (Id.). As to Washington's hand injury, Dr. Getachew avers that he did not receive any sick call or notice

---

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

regarding the hand injury, was never aware of it, and did not see Washington for the hand injury. (Id.). Dr. Getachew notes that the hand injury appears to have healed by August 1, 2022. (Id.).

### 3. Medical Records

Medical records attached to Dr. Getachew's Declaration show that Washington submitted a sick call complaining of a sore throat and nausea on November 4, 2021, and he also complained that he could not keep food down. (Medical Rs. Part One at 8, ECF No. 14-3). On November 10, 2021, Washington saw Vincent O. Nwuzor, RN, and stated that he did not have pain or a sore throat, but he could not keep food down. (Medical Rs. Part Seven at 31, ECF No. 14-9). Nwuzor noted that Washington's bowel sounded active in all quadrants. (Id.).

On November 29, 2021, Washington submitted a sick call slip, stating that he was suffering worsening nausea, some days could not eat, and the pain prevented him from lying on his stomach to sleep. (Medical Rs. Part One at 9). He saw Ernest K. Massalla, RN, on December 6, 2021 for nausea, vomiting, and diarrhea, stating that he goes days without eating. (Medical Rs. Part Seven at 29). Massalla observed that Washington appeared pale and sick, encouraged him to maintain hydration, and referred him to a provider. (Id.). Dr. Getachew was listed as the provider. (Id. at 30).

On December 7, 2021, Washington saw Nurse Massalla for nausea again. (Medical Rs. Part Seven at 28). Per Dr. Getachew's orders, Washington was transferred to the WCI infirmary. (Id.). Dr. Getachew ordered labs, nothing by mouth, IV normal saline, and vital signs every four hours. (Getachew Decl. ¶ 8). On December 8, 2021, Washington saw

3

Joginder Mehta, MD, at the WCI infirmary. (Medical Rs. Part Seven at 17–18). The nurse reported that Washington had green mucinous stool. (Id. at 17). Washington's diarrhea persisted, and Dr. Mehta noted discomfort in palpating the abdomen. (Id.). He prescribed the antibiotics Cipro and Flagyl for seven days for colitis and encouraged fluids. (Id.). Lab results indicated thrombocytosis reactive and microcytic anemia. (Id.). Dr. Mehta discussed the situation with Dr. Getachew, who recommended that Washington be sent to the emergency room. (Id. at 18; Getachew Decl. ¶ 8). Dr. Getachew explains that "[r]eactive thrombocytosis occurs when another disease or condition causes an elevated platelet count. Microcytic anemia is a type of anemia in which red blood cells are smaller than usual. Iron deficiency causes microcytic anemia." (Getachew Decl. ¶ 9).

Washington was admitted to the UPMC Western Maryland Hospital from December 8–14, 2021. (Medical Rs. Part One at 17–19). Hospital records indicate that he presented with three months of diarrhea and abdominal discomfort and reported weight loss of 20 to 30 pounds, but no significant prior medical history. (Id. at 18). After undergoing multiple tests including a CT scan, chest x-ray, upper GI endoscopy, and colonoscopy, Washington was diagnosed with Crohn's ileocolitis, iron deficiency anemia, possible sickle cell trait, and subclinical hypothyroidism. (Id. at 17). He was transfused with two units of packed red blood cells, started on iron supplementation and daily prednisone, and referred for an outpatient follow-up with a gastroenterologist. (Id. at 18). The discharge instructions also directed that he follow-up with a provider at WCI within 5–7 days. (Id.).

On December 15, 2021, Washington saw Dr. Mehta at the WCI infirmary for a follow-up to his hospital stay. (Medical Rs. Part Six at 40–41, ECF No. 14-8). Washington

4

denied having fever, chills, nausea, vomiting, chest pain, or shortness of breath. (Id. at 40). Dr. Mehta continued his medications, ordered a high calorie diet plan including Ensure Plus supplement for one month, and a follow-up with a provider in ten days. (Id. at 41). Dr. Getachew approved Dr. Mehta's order for Ensure Plus. (Getachew Decl. ¶ 11). Washington was discharged from the WCI infirmary and transferred back to NBCI that same day. (Medical Rs. Part Six at 41).

On December 18, 2021, and January 3, 2022, Washington submitted sick call slips complaining that he was not receiving the Ensure Plus as ordered. (Medical Rs. Part Two at 6, 8, ECF No. 14-4). Both sick call slips were signed by a provider on February 2, 2022, with a note stating, "[r]eceived by Inter-Departmental Mail. Please resubmit by the Sick Call Process as outlined in your inmate Handbook. Must be on new sick call form and placed in Sick Call Box." (Id.).

On January 19, 2022, Oriaku Ijoma, RNP, renewed Washington's medications and submitted a new request for Ensure for 120 days, which was approved. (Medical Rs. Part Six at 33–35). Ijoma also requested that Washington be scheduled for chronic care within four weeks. (Id. at 35).

Washington submitted sick calls on February 10 and 23, 2022 regarding stomach pain and cramping. (Medical Rs. Part Two at 9–10). On March 11, 2022, Dr. Getachew saw Washington via telehealth for a chronic care visit with Nurse Lori Keister assisting in the physical examination. (Medical Rs. Part Six at 29–30). Washington reported loose stools, occasionally bloody, three times per day. (Id. at 29). Dr. Getachew noted that Washington has a history of inflammatory bowel disease, is currently on prednisone

5

following his hospital admission, and has gained 23 pounds since the hospital admission. (Id.). Dr. Getachew found that all vital signs were normal and abdominal examination was normal. (Id.). He ordered new labs and scheduled Washington for a follow-up in one week. (Id.).

On March 25, 2022, Dr. Getachew saw Washington via telemedicine for a follow-up, and Nurse Keister assisted. (Id. at 23–24). Washington reported feeling much better with prednisone. (Id.). Dr. Getachew noted that the pathology report from the biopsy Washington underwent in the hospital revealed inflammatory bowel disease, most likely ulcerative colitis. (Id.). Labs showed that Washington had iron deficiency anemia due to colitis, and Washington was started on oral iron. (Id.). Dr. Getachew submitted a request for Washington to see a local gastroenterologist for follow-up, which was approved on March 29, 2022. (Id. at 19, 21).

On April 18, 2022, Washington declined to be assessed by medical after an altercation with other inmates. (Id. at 18; Medical Rs. Part Two at 25). Washington submitted a sick call slip on April 30, 2022, complaining that he did not realize that he was injured at the time of the altercation, his right hand was injured, and it was becoming increasingly difficult to perform simple tasks. (Medical Rs. Part Two at 27). The response dated May 10, 2022 notes that the patient was seen on May 3, 2022 and referred to a provider. (Id.).

On May 3, 2022, Washington saw Jennifer L. VanMeter, RN, for pain in his right hand. (Medical Rs. Part Six at 13–14). Nurse VanMeter observed the hand to be swollen with notable bruising and discoloration. (Id. at 13). She gave him ice and requested x-rays

6

and a provider follow-up. (Id.). Dr. Getachew avers that while Nurse VanMeter notified the scheduler and assigned the task in the electronic health records, "it does not appear that the patient was placed on my schedule to be seen." (Getachew Decl. ¶ 16).

Records show that on May 13, 2022, Washington refused a sick call appointment regarding his Crohn's flareup, however he did not sign the release. (Medical Rs. Part Six at 12). On May 18, 2022, he submitted a sick call slip complaining of stomach pain and cramps. (Medical Rs. Part Two at 29). The provider note on this slip, dated May 25, 2022, indicates that Washington was on a medical trip and would have to reschedule the sick call visit. (Id.). Washington submitted an additional sick call slip regarding his hand on May 20, 2022, and another on May 22, 2022, regarding stomach pain and blood in stool. (Id. at 31–32). Both of these slips had the same May 25, 2022 notation regarding rescheduling the visit due to a medical trip. (Id.). On June 22, 2022, Washington submitted another sick call slip regarding stomach pain and cramps and bloody stool. (Id. at 34).

On July 5, 2022, Washington saw gastroenterologist Nii Lamptey-Mills, MD for a follow-up regarding possible Crohn's disease and anemia. (Id. at 13–16). Washington reported intermittent diarrhea and diffuse abdominal pain. (Id.). Dr. Lamptey-Mills prescribed two 50 mg caps of Pentasa three times per day for Crohn's disease and ordered new labs. (Id.). Dr. Lamptey-Mills also ordered iron tablets and noted that EGD biopsies showed duodenitis, likely related to Crohn's, but would require celiac disease screening if symptoms persisted. (Id.). He recommended a follow-up in two months. (Id.). Dr. Getachew requested the Pentasa on July 26, 2022. (Medical Rs. Part Six at 8).

On August 1, 2022, Washington saw Adane Negussie, PA for a provider visit. (Id. at 5–7). Washington stated that his right hand was improving and that he did not require pain medications. (Id. at 5). Negussie found that his range of motion was intact and that the mild swelling was improving. (Id. at 5–6). Washington had no complaints and denied having chest pains, shortness of breath, fever or chills, nausea, vomiting, diarrhea, or headache. (Id. at 5).

On October 3, 2022, Washington saw PA Negussie for a provider sick call, complaining of right-sided abdominal pain that comes and goes as well as blood in his stool. (Id. at 2–4). Negussie noted an external hemorrhoid, which Washington attributed to consuming wheat bread. (Id.). Negussie prescribed iron tablets and added hemorrhoidal cream, Tylenol, and promethazine (Phenergan) for nausea and vomiting. (Id. at 3–4). Dr. Getachew requested renewal of Pentasa on October 17, 2022. (Id. at 1).

On November 7, 2022, Washington submitted a sick call slip stating that he was experiencing stomach pains and severe diarrhea and that he was waking up sweating. (Medical Rs. Part Two at 40). Washington stated that he believed his Crohn's was flaring up and that the medication was not working. (Id.). On November 10, 2022, Washington saw Jessica Coffman, RN. (Medical Rs. Part 5 at 39–41, ECF No. 14-7). Nurse Coffman spoke with an onsite provider, who gave a verbal order for labs. (Id. at 39). She emailed chronic care regarding management of Crohn's and noted that there had not been a chronic care visit documented since March 25, 2022. (Id.). Washington reported that he was taking Pentasa as prescribed. (Id.).

On January 16, 2023, Washington submitted a sick call slip stating that he was using the restroom every time he eats or drinks, that he was supposed to be seen weeks ago, and that he was having stomach cramps. (Medical Rs. Part Two at 41). Washington saw Annette M. Jennings, RN, on January 18, 2024, reporting severe diarrhea and abdominal cramping as well as feeling dizzy and lightheaded. (Medical Rs. Part Five at 37–38). Nurse Jennings noted that his skin was dry. (Id.). The Regional Medical Director was notified and ordered transfer to the emergency department. (Id.). Washington was admitted to UPM Western Maryland Hospital where he underwent a CT scan and labs, as well as IV fluids. (Medical Rs. Part Two at 42, 46). He was diagnosed again with Crohn's disease, chronic anemia, and chronic thrombocytosis. (Id. at 46). A five-day regimen of prednisone was ordered before he was transferred back to the prison. (Id.). Upon arrival at the WCI infirmary, Washington had stable vitals and stated that he felt much better, and he was returned to NBCI with orders for prednisone. (Medical Rs. Part Five at 33).

On January 27, 2023, Washington saw Dr. Mehta for a chronic care and provider visit. (Id. at 26). Dr. Mehta discussed the patient with gastroenterologist Dr. Vootla, who recommended that he start Pentasa and that if he did not respond to the Pentasa, he should return for follow-up and possibly start a biologic agent. (Id.). He continued the iron supplements and other medications. (Id. at 28).

On February 4, 2023, Washington submitted a sick call slip stating that the smell of food made him nauseous and that he was vomiting and had pain through his midsection. (Medical Rs. Part Three at 8, ECF No. 14-5). He saw Nurse Massalla for a sick call on February 5, 2023, and told her that his medications were not working. (Medical Rs. Part

9

Five at 23). She referred him to a provider. (Id. at 24). On February 7, 2024, Washington saw Dr. Mehta for an urgent provider visit. (Id. at 19, 22). Dr. Mehta noted that Washington had vomiting, diarrhea, fever, chills, and a history of ileocolitis and iron deficiency anemia. (Id.). After consulting with Dr. Getachew, Dr. Mehta admitted Washington to the WCI infirmary to be given IV fluids, antibiotics, and Zofran for nausea as well as for labs. (Id.). However, Brenda Reese, RN noted that he had worsening symptoms and IV attempts were unsuccessful, so she received an order to transfer Washington to the hospital. (Id. at 13–14).

Washington was admitted to the hospital from February 7–13, 2023, for rehydration, IV antibiotics, and steroids due to Crohn's exacerbation. (Id. at 7; Medical Rs. Part Three at 11–16). Upon admission, he reported that he had been on Pentasa and believed it was working until December 2022 when he began to have increased symptoms. (Id. at 11). A gastroenterologist was consulted and recommended IV steroids and IV Protonix. (Id. at 13). Washington required blood transfusions to stabilize his hemoglobin and ongoing symptoms. (Id.). Upon discharge, he was prescribed tapering steroids and Protonix per the instructions of gastroenterologist Dr. Vootla and recommended to follow-up with a specialist. (Id. at 14). The instructions were communicated to the WCI infirmary with emphasis that good follow-up care is imperative. (Id.).

On February 21, 2023, Washington saw PA Negussie for follow-up. (Medical Rs. Part Four at 19, 21, ECF No. 14-6). PA Negussie continued the current medications, prescribed Simethicone for bloating, and ordered a high-calorie diet. (Id. at 21). On March 20, 2024, Washington saw PA Negussie again to review labs. (Id. at 12, 15). Washington

10

reported that he was still seeing blood when wiping but that it was improving. (Id. at 12). He denied other symptoms including dizziness, chest pain, fever, chills, nausea, vomiting, diarrhea, or headaches. (Id.).

On April 7, 2023, Washington saw Dr. Mehta to follow-up on labs taken April 4, 2023. (Id. at 7, 9). He denied abdominal pain, reported a good appetite, but still reported blood in his stool. (Id.). Dr. Mehta discussed the patient with gastroenterologist Dr. Chatruff because Dr. Vootla was unavailable, and Dr. Chatruff recommended he call back on Monday or start prednisone. (Id.). Washington did not want to take Pentasa, but Dr. Mehta refilled it anyway and requested a provider follow-up. (Id. at 7–8).

**B.     Procedural Background**

Washington filed a Complaint on October 31, 2022 alleging that Dr. Getachew and Corizon Health failed to provide him adequate medical care with regard to his hand injury and Crohn's disease in violation of the Eighth Amendment. (Compl. at 9–15, ECF No. 1). The case was stayed as to Corizon Healthcare, Inc. on July 18, 2023. (ECF No. 17). Dr. Getachew filed a Motion to Dismiss, or in the alternative, for Summary Judgment on July 12, 2023. (ECF No. 14). Washington filed a Motion to Dismiss, construed as an Opposition to Dr. Getachew's Motion, on October 26, 2023. (ECF Nos. 20, 21). Dr. Getachew did not file a reply.

11

## II.     DISCUSSION

### A.     Standard of Review

#### 1.     Conversion

Dr. Getachew's Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448–449 (4th Cir. 2011) (citing Gay v. Wall, 761 F.2d 175, 178 (4th Cir. 1985). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d) explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id at 246–247 (quoting 10B

13

Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Here, the Court concludes that both requirements for conversion are satisfied. The first requirement is satisfied because Washington was on notice that the Court might resolve the Motion under Rule 56. Dr. Getachew styled his Motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. Additionally, the Court informed Washington about the Motion and the need to file an opposition. (Rule 12/56 Notice at 1, ECF No. 15). In response, Washington filed his own Motion to Dismiss and Supplement to the Motion to Dismiss, in which he explains why he believes Dr. Getachew's Motion should be denied. (Mot. Dismiss at 1–2, ECF No. 20; Suppl. Mot. Dismiss at 1–4, ECF No. 21). Washington's Motion to Dismiss and Supplement shall be construed as his response in opposition to Dr. Getachew's Motion. The second requirement is satisfied because Washington did not request discovery in any form. Accordingly, the Court will consider documents outside of Washington's Complaint in resolving Dr. Getachew's Motion and will treat Dr. Getachew's Motion as a motion for summary judgment.

### 2. Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper when the movant demonstrates, through "particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.

Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 250).

**B.     Analysis**

Washington alleges that Dr. Getachew failed to provide him adequate medical care with regard to his hand injury and Crohn's disease. (Compl. at 9–15). The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; Gregg v. Georgia, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson

v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto v. Stansberry, 841 F.3d 219, 228–29 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015)).

Mere negligence or malpractice does not rise to a constitutional level of deliberate indifference. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew of at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44 (4th Cir. 1977)).

The record before the Court demonstrates that Dr. Getachew was not deliberately indifferent to Washington's medical needs. With regard to Washington's hand injury, the record shows that while his sick calls went unaddressed for several weeks and he was never scheduled for an x-ray or provider visit as requested, Dr. Getachew did not know about the hand injury nor was he responsible for scheduling x-rays or provider visits. (Medical Rs.

18

Part Six at 13–14; Getachew Decl. ¶ 16). Dr. Getachew cannot be deliberately indifferent to a condition of which he is unaware. In addition, the hand injury, which occurred in April of 2022, had healed by August of 2022. (Id. at 5–7).

As to Washington's Crohn's disease, it is clear that he has an extremely serious medical condition that resulted in months of suffering from abdominal pain, vomiting, diarrhea, and weight loss as well as at least two hospital admissions. However, the record reflects that while his sick call slips may not have been responded to as quickly as he would have liked and that his high-calorie diet was interrupted at times, he was regularly provided with medical treatment and monitoring in consultation with a gastroenterologist, and he was admitted to the infirmary and transferred to the hospital as necessary. Dr. Getachew ordered non-formulary drugs and lab work as recommended by the gastroenterologist and directed admission to the infirmary and transfer to the hospital when appropriate. Washington argues that he still has "yet to receive (any) examination by an external physician, or any routine checks ups or follow ups concerning chronic care by any person[] that is employed or by proxy of the Defendant." (Suppl. Mot Dismiss at 1). While Washington seems to believe that he requires the care of a physician outside the prison system, he does not appear to directly dispute Dr. Getachew's assessment of his personal involvement in treating his Crohn's disease. Rather, Washington's statements appear to contest the manner in which the medical care was provided. While Washington alleges that he was not seen for follow-ups or chronic care, the record shows that he was regularly seen by providers, including Dr. Getachew, for follow-ups to hospital visits, lab work, and sick visits as referred by nurses. There is no allegation that he did not receive medication or

tests as prescribed and ordered. Washington does not allege, and the evidence does not show, that Dr. Getachew personally failed to provide him with adequate medical care. While there is no question that Washington suffers from a very serious medical condition, the evidence does not show that Dr. Getachew was deliberately indifferent to it. Therefore, Dr. Getachew is entitled to summary judgment.

### III.  CONCLUSION

For the foregoing reasons, Dr. Getachew's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 14), construed as one for summary judgment, will be granted, and Washington's Motion to Dismiss (ECF No. 20) will be denied. A separate Order follows.

Entered this 16th day of September, 2024.

/s/<br>
George L. Russell, III<br>
Chief United States District Judge